UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jonathan Roberts and Charles Vavruska,<br><br>                                     Plaintiffs,<br><br>-against-<br><br>Mary T. Bassett, in her official capacity as Commissioner for New York State Department of Health; New York City Department of Health and Mental Hygiene,<br><br>                                     Defendants. | Case No. 1:22-cv-00710-NGG-RML<br><br>**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Served February 28, 2022** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

ARGUMENT ..................................................................................................................................... 2

    I.   Plaintiffs Are Likely to Prevail on the Merits ................................................................. 2

        A.  Plaintiffs' Challenge to the Directives Is Not Moot ........................................... 2

        B.  Plaintiffs Have Article III Standing ..................................................................... 3

        C.  The Directives Are Subject to Strict Scrutiny ..................................................... 6

        D.  Defendants' Directives Do Not Further a Compelling Interest .......................... 7

        E.  Defendants' Directives Are Not Narrowly Tailored ........................................... 8

    II.  Plaintiffs Satisfy the Other Preliminary Injunction Factors ......................................... 10

CONCLUSION ................................................................................................................................ 10

AFFIRMATION OF SERVICE ....................................................................................................... 12

## TABLE OF AUTHORITIES

### Cases

*Adarand Constructors, Inc. v. Pena*,
  515 U.S. 200 (1995)..................................................................................................6

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
  141 S. Ct. 2485 (2021)..............................................................................................7

*Baur v. Veneman*,
  352 F.3d 625 (2d Cir. 2003).......................................................................................4

*Builders Ass'n of Greater Chicago v. Cty. of Cook*,
  256 F.3d 642 (7th Cir. 2001) ......................................................................................8

*Carey v. Klutznick*,
  637 F.2d 834 (2d Cir. 1980).....................................................................................10

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*,
  364 F. Supp. 3d 253 (S.D.N.Y. 2019)..................................................................6, 10

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989).................................................................................................7, 9

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)..................................................................................................5

*Comer v. Cisneros*,
  37 F.3d 775 (2d Cir. 1994).........................................................................................4

*Dean v. Town of Hempstead*,
  527 F. Supp. 3d 347 (E.D.N.Y. 2021) .......................................................................5

*Eng'g Contractors Ass'n of S. Fla. v. Metro Dade Cty.*,
  122 F.3d 895 (11th Cir. 1997) ................................................................................7–8

*Honadle v. Univ. of Vt. & State Agric. Coll.*,
  56 F. Supp. 2d 419 (D. Vt. 1999)...............................................................................6

*Irish Lesbian & Gay Org. v. Giuliani*,
  143 F.3d 638 (2d Cir. 1998)....................................................................................2–3

*Meland v. Weber*,
  2 F.4th 838 (9th Cir. 2021) ........................................................................................4

*Mitchell v. Washington*,
  818 F.3d 436 (9th Cir. 2016) ..................................................................................6–7

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993) ........................................................................................................... 3

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................................................... 10

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ........................................................................................................... 6

*Shaw v. Hunt*,
    517 U.S. 899 (1996) ........................................................................................................... 7

*Van Wie v. Pataki*,
    267 F.3d 109 (2d Cir. 2001) ............................................................................................... 3

*Vitolo v. Guzman*,
    999 F.3d 353 (6th Cir. 2021) .............................................................................................. 7

*Wynn v. Vilsack*,
    545 F. Supp. 3d 1271 (M.D. Fla. 2021) ............................................................................. 7

*Zhong v. U.S. Dep't of Justice*,
    480 F.3d 104 (2d Cir. 2007) ............................................................................................... 7

**Other Authorities**

Blake, Aaron, *'Most people are going to get covid': A momentous warning at a
    Senate hearing*, Wash. Post, Jan. 11, 2022,
    https://www.washingtonpost.com/politics/2022/01/11/most-people-are-going-
    get-covid-momentous-warning-senate-hearing/ ................................................................ 5

Wash. Dep't of Health, *Interim-DOH Guidance on Prioritization
    for Use of Anti-SARS-CoV-2 Monoclonal Antibodies*,
    https://doh.wa.gov/sites/default/files/2022-02/821-155-
    InterimMonoclonalAntibodyGuidance.pdf (last updated Feb. 23, 2022) ..................... 9–10

New York City Dep't of Health & Mental Hygiene, 2022 Health Advisory #2,
    Paxlovid is Available for COVID-19 Treatment in New York City,
    https://www1.nyc.gov/assets/doh/downloads/pdf/han/advisory/2022/covid-
    paxlovid-available.pdf (Feb. 1, 2022) ................................................................................ 2

New York State, Oral Antivirals,
    https://coronavirus.health.ny.gov/oral-antivirals (Feb. 27, 2022) ..................................... 4

Defendants' responses are exemplars of self-contradiction. On one hand, Defendants claim that issuing race-neutral guidance is "akin to intentionally maintaining a racially discriminatory policy for distributing live-saving drugs." City Opp. 12–13.[1] On the other hand, their current directives purportedly do not "require that any action be taken with respect to any individual based on their race or ethnicity." State Opp. 19. Similarly, Defendants assert both that the directives' use of race "ensure[d] that all high-risk patients had access to live-saving treatments," City Opp. 15, and also that they merely "guide and focus busy clinicians through conversations with their patients." Heslin Decl. ¶ 9. Defendants cannot have it both ways. Their responses underscore that a preliminary injunction is needed to ensure that lifesaving treatments are distributed without regard to race.

This Court has jurisdiction to hear this case because Plaintiffs have standing and the case is not moot. If Defendants' directives outright eliminated eligibility for patients of one race, there would be no doubt that Plaintiffs would have standing to challenge those directives. It should be no different that Defendants use race as one factor in prioritizing individuals who seek COVID-19 treatments. *See* Complaint, Exh. B (using race as a risk factor); *id.* at 2 (directing providers to "prioritize patients, in part, based on "[n]umber of risk factors"). And the case is not moot because the guidance remains in force and the State concedes that "[e]ven though there is not currently a shortage of oral antiviral treatments, the pandemic has taught us that supply chain disruptions can happen at any time." Heslin Decl. ¶ 28. Finally, because Defendants' use of race is overbroad, mechanical, and unsupported by objective data, it is unconstitutional under the Equal Protection

---

[1] For ease of reference, Plaintiffs refer to Defendant Bassett as the State and the declaration in support as the Heslin Declaration. Plaintiffs also refer to Defendant New York City Department of Health and Mental Hygiene as the City and the declaration in support as the Morse Declaration.

1

Clause.[2] Plaintiffs' Motion for a Preliminary Injunction should be granted.

## ARGUMENT

I.   **Plaintiffs Are Likely to Prevail on the Merits**

　　A.   **Plaintiffs' Challenge to the Directives Is Not Moot**

Defendants are wrong in asserting that the current supply of COVID-19 treatments renders the case moot. "A case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 647 (2d Cir. 1998). That is not the case here. In support of its claim that there is no longer a shortage, the City cites an advisory it issued on February 2. *See* Morse Decl. ¶ 29 & n.22. But the advisory itself notes that "supplies remain limited." NYC Health, Health Advisory #2: Paxlovid is Available for COVID-19 Treatment in New York City.[3] And the State acknowledges that "[e]ven though there is not currently a shortage of oral antiviral treatments, the pandemic has taught us that supply chain disruptions can happen at any time." Heslin Decl. ¶ 28.

Perhaps that is why neither the State nor the City has retracted the directives The State still lists its directive as "current" on its website, *see* Fa Decl., Exh. 3, and the City does not claim that it has followed up with any of the 75,000 medical providers and other registered individuals to whom it sent the City directive to counsel them that the directive should now be ignored. *See* Morse Decl. ¶ 22. There's also reason to believe the shortage will recur. As Delta, Omicron, and other surges have taught us, COVID is an unpredictable and persisting problem. Indeed, the City is still under an emergency COVID order. *See id.* ¶¶ 10–11. And the shortage giving rise to this

---

[2] Defendants take issue with one statistic cited in Plaintiffs' initial motion. *See, e.g.*, State Opp. 4 & n.2; *but see* Fa Decl. Exh. 1 & 2. Regardless of how the Court resolves that dispute, however, Defendants' own statistics show that their directives violate the Equal Protection Clause.
[3] https://www1.nyc.gov/assets/doh/downloads/pdf/han/advisory/2022/covid-paxlovid-available.pdf (Feb. 1, 2022).

2

lawsuit was caused in part by the "largest wave of reported cases yet" from November 2021 to January 2022. *Id.* ¶ 11. This "highly transmissible" variant "more easily infected persons who had existing immunity from previous infection or vaccination than previous variants of the virus." *Id.* The City acknowledges, in light of this and other "new variants and surges," that "community transmission remains an ongoing public health concern." *Id.*

At the very least, this case falls within the capable of repetition yet evading review exception to mootness. *See Irish Gay & Lesbian Org.*, 143 F.3d at 647–49. Unpredictable surges in COVID-19 cases make the dispute in this case capable of repetition. Yet, in a case like this one, fluctuations in case numbers can easily allow a dispute to evade review. *See id.* at 648 (citing cases for the proposition that "a few weeks" was "clearly insufficient for full litigation of [plaintiff's] claims"). But regardless of the momentary status of COVID or the supply of treatment, Plaintiffs requested nominal damages, which precludes mootness. *Van Wie v. Pataki*, 267 F.3d 109, 115 & n.4 (2d Cir. 2001) (noting that "plaintiffs in election cases could avoid the potential for mootness by simply expressly pleading that should the election pass before the issuance of injunctive relief, nominal money damages are requested").

### B. Plaintiffs Have Article III Standing

As Defendants concede, an injury-in-fact in cases involving racial preferences is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." State Opp. 8 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)). Here, Plaintiffs are injured by the imposition of a barrier to treatment. Defendants try to get around this problem by distorting the directives themselves. The directives are not just ways to "focus busy clinicians through conversations," Heslin Decl. ¶ 9, but instead call on physicians and providers to prioritize patients for treatment

3

on the basis of risk factors, including race. *See* PI Mot. 3–5. It is of no moment that race may not be the dispositive factor for every patient who seeks treatment. What matters is that "(1) there exists a reasonable likelihood that the plaintiff is in the disadvantaged group, (2) there exists a government-erected barrier, and (3) the barrier causes members of one group to be treated differently from members of the other group." *Comer v. Cisneros*, 37 F.3d 775, 793 (2d Cir. 1994); *see also Baur v. Veneman*, 352 F.3d 625, 633 (2d Cir. 2003) (noting that "threatened harm in the form of an increased risk of future injury may serve as injury-in-fact")

Defendants also assert that the government "will not take enforcement actions against practitioners or hospitals in relation to" the directives. But Plaintiffs' injury does not depend on whether penalties are doled out to practitioners or hospitals. Instead, the Court may presume at this preliminary stage that providers and physicians will follow the directives—particularly where, as here, Defendants are both regulators and suppliers.[4] *Meland v. Weber*, 2 F.4th 838, 846 (9th Cir. 2021) ("A law may require or encourage action whether or not it imposes a monetary sanction for noncompliance."). The City concedes that it has distributed the guidance to "75,000 email addresses aimed at medical providers and other registered individuals." Morse Decl. ¶ 22. It strains credulity to believe that they will simply ignore it and it defies explanation why Defendants would issue such a directive if they expected individuals to fully ignore it.

Further, requiring Plaintiffs to wait until contracting COVID-19 to file suit would effectively shield the directives from review, given that antivirals must be taken within five days of symptom onset, which does not leave enough time for an individual to file suit and obtain judicial review. COVID-19 is endemic and top public health officials have stated that most people

---

[4] New York State, Oral Antivirals, https://coronavirus.health.ny.gov/oral-antivirals (Feb. 27, 2022) (noting that "New York State received a limited supply of both Paxlovid and molnupiravir from the federal government" and "New York City region has elected to receive its distribution to one pharmacy").

are going to contract Coronavirus. Aaron Blake, *'Most people are going to get covid': A momentous warning at a Senate hearing*, Wash. Post, Jan. 11, 2022.[5] Plaintiffs therefore have standing now to seek prospective relief.

Finally, the State alleges that Plaintiffs' injury relies on "attenuated chain of inferences necessary to find harm." State Opp. 9 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *id.* at 13–14. But that is based on a misunderstanding of the injury in an equal protection case. As the State concedes elsewhere, the injury in this case is not the ultimate denial of the treatments, but the government-imposed barriers to obtaining those treatments.

The State alone argues that Plaintiffs' injury is not traceable to Defendants or redressable by a favorable court decision. State Opp. 14–17. It is wrong on both fronts. The State contends that "Plaintiffs would only be denied access to those treatments if their practitioners independently concluded that such treatments were not clinically appropriate, given each Plaintiff's own unique medical history, risk factors, and circumstances." *Id.* at 15. But it is the State that has "concluded that healthcare providers should consider non-white race or Hispanic/Latino ethnicity an independent risk factor." *Id.* at 21. It cannot blame physicians or practitioners if they follow the government-created guidance. The State's arguments on redressability are similarly misguided. It attempts to shift focus to both the CDC and physicians, *id.* at 14–15, but "[t]he redressability prong does not demand that court-ordered relief completely redress all injury." *Dean v. Town of Hempstead*, 527 F. Supp. 3d 347, 406 (E.D.N.Y. 2021) (citing cases). In all events, the CDC Guidance does not employ race in the same way as the directives, *see* Heslin Decl. Exh. C at 50, and the CDC is neither a regulator nor a supplier in the same way as Defendants here. PI Mot. 10; *see also* Morse Decl. ¶ 22 (noting that City distributed its guidance document to "75,000 email

---

[5] https://www.washingtonpost.com/politics/2022/01/11/most-people-are-going-get-covid-momentous-warning-senate-hearing/

addresses aimed at medical providers and other registered individuals"). Plaintiffs have standing to assert their equal protection claim.

### C. The Directives Are Subject to Strict Scrutiny

Defendants' directives are subject to strict scrutiny because they employ express racial classifications. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). Defendants argue for rational basis review. Yet the rational basis standard has no place where, as here, the government is drawing distinctions on the basis of racial classifications. Complaint, Exh. B at 3. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

The State contends that the directives do not distribute benefits or burdens on the basis of race. It is wrong. The plain language of the directives use race as an independent risk factor that allows persons who are Hispanic or non-white to receive priority for treatments. *See* PI Mot. 4. In fact, the State spends much of its brief doubling down on its use of race as an independent risk factor, *see* State Opp. 4–6, while simultaneously attempting to evade strict scrutiny by arguing that it does not "require that any action be taken with respect to any individual based on their race or ethnicity." *Id.* at 19. Once again, it can't have it both ways. And an express race-based policy is subject to strict scrutiny even if race is one of many factors and not necessarily dispositive in every case. *See Mitchell v. Washington*, 818 F.3d 436, 444–46 (9th Cir. 2016) (consideration of the race-related success rate of treatment as one of many factors subject to strict scrutiny).[6] Strict scrutiny applies, and Defendants cannot satisfy it.

---

[6] Defendants' selection of authorities in arguing to the contrary is puzzling. The State cites *Honadle v. Univ. of Vt. & State Agric. Coll.*, 56 F. Supp. 2d 419, 427–28 (D. Vt. 1999), State Opp. 19, but that case involved a program that appeared to "enhance equal opportunity through expanded recruitment" rather than to instill racial preferences in hiring. The City points to *Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 364 F. Supp. 3d 253, 276–77 (S.D.N.Y. 2019). City Opp. 8. But that case, unlike this case, involved a facially neutral program which does not call for strict scrutiny in every instance.

6

### D. Defendants' Directives Do Not Further a Compelling Interest

Defendants' responses underscore that the directives do not further any compelling interest.[7] Both Defendants invoke a compelling interest in "protecting the public health of its citizens," State Opp. 22; City Opp. 10 & n.7, but a public health crisis does not immunize government action from constitutional review. *See, e.g., Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2490 (2021) (vacating stay of decision enjoining CDC's eviction moratorium). The City (but not the State) also points to a purported interest in remedying discrimination. But beyond mere statistical disparities, it does not point to a single instance of discrimination that it is purportedly attempting to remedy. *See* City Opp. 10–13. The caselaw is clear that government cannot use race to "remedy" statistical disparities absent evidence of actual discrimination. *See Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (noting that unless it proves intentional discrimination, "[s]tatistical disparities don't cut it" as a compelling interest); *see also Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest.").

Defendants have failed to establish the "factual predicate" for their race-based directives. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989). The statistics Defendants cite in their responses suffer from two fatal flaws. First, "[w]here a race-neutral basis for a statistical disparity can be shown, the Court can give that statistical evidence less weight." *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1280 (M.D. Fla. 2021) (granting nationwide preliminary injunction enjoining USDA's race-based farm loan debt relief program) (citing *Eng'g Contractors Ass'n of*

---

[7] The State does not respond to most of Plaintiffs' arguments on this front. *Compare* PI Mot. 11–13, *with* State Opp. 22. Therefore, it should be deemed to have forfeited any such response. *See Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 123 (2d Cir. 2007) (deeming attorney general's silence of petitioner's issue exhaustion problem to constitute waiver); *Mitchell*, 818 F.3d at 446 (Where "[Defendant] failed to offer *any* compelling justification for the racial classification," he has "failed to meet his burden under the strict scrutiny standard.").

7

*S. Fla. v. Metro Dade Cty.,* 122 F.3d 895, 923 (11th Cir. 1997)). Second, government "that has discriminated just against blacks may not by way of remedy discriminate in favor of blacks and Asian-Americans and women." *Builders Ass'n of Greater Chicago v. Cty. of Cook*, 256 F.3d 642, 646 (7th Cir. 2001). Yet the State's own evidence suggests that its race-based directive is at best overbroad. For instance, the State contends that "[p]erhaps the most convincing data point" is a chart compiled by the CDC. *See* Heslin Decl. ¶ 21. But that chart reveals that race and ethnicity are risk markers for *other* conditions or behavior that affects health, such as "socioeconomic status, access to health care, and exposure to the virus related to occupation." *Id.* And it shows that Asians whose race is considered a risk factor fare better on every measure—cases, hospitalizations, and deaths. *Id.*

The rest of the studies cited by the State suffer from similar flaws. *See* Heslin Decl. ¶ 16 (citing CDC data that "health care and social inequities," not biological differences due to race, result in worse COVID-19 outcomes); *id.*, Exh. D at 4 (not controlling for race-neutral factors in changes in life expectancy and concluding that Hispanic whites have a higher life expectancy than non-Hispanic whites despite its "disadvantaged socioeconomic profile"); *id.*, Exh. E at 1 (stating that race-neutral factors such as "access to quality healthcare, general health status, education, economic stability," contribute to an increased likelihood of severe illness from members of minority racial groups), *id.*, at Exh. G (acknowledging that previous studies suggest disparities can be explained by factors such as socioeconomic status, lack of testing for SARS-CoV-2 infection, and virus exposure due to employment in essential-worker occupations).

### E.  Defendants' Directives Are Not Narrowly Tailored

Defendants' directives also fail the requirement of narrow tailoring. Defendants assert that the directives allow for individualized consideration, but that is so only if physicians ignore the

8

plain language of the directives. The directives instruct physicians to use race mechanically—as a risk factor for *every* non-white or Hispanic individual. Complaint, Exh. B at 3. The directives also fail narrow tailoring because they are overinclusive. Race is a risk factor for every non-white or Hispanic person in New York—and every one of them would be prioritized over Mr. Roberts under a straightforward reading of the directives. Further, the directives consider everyone a non-white race as a risk factor—even though, according to New York's statistics, Asian persons have fared better than white persons during the pandemic. *See* Heslin Decl. ¶ 21. The "random inclusion of racial groups" for which there is no evidence of past discrimination further demonstrates that the directives are not narrowly tailored. *See Croson*, 488 U.S. at 506.

      Defendants' responses do not invoke any race-neutral alternatives that they have tried to meet their interests. But they do reveal that many race-neutral alternatives could be effective. For instance, the City notes that "communities of color face barriers accessing health care, such as lack of insurance, cultural and language barriers, and inequities in treatment that have caused some communities to distrust the government and healthcare system." City Opp. 8. But government may use race-neutral methods to eliminate those barriers. Under Defendants' directives, however, a white individual who lives in a community of color and faces all of the barriers identified by the City would not have race as a risk factor. A non-white or Hispanic individual who has never faced any of the barriers identified by the City would have race as a risk factor. That is the essence of a policy that fails narrow tailoring.

      Finally, Defendants' use of race is particularly inexcusable given that many other states, when confronted with the same problem, have not resorted to race. The State of Washington, for example, allows physicians to consider many of the same race-neutral factors that are referenced in New York's directives. *See* Wash. Dep't of Health, *Interim-DOH Guidance on Prioritization*

9

*for Use of Anti-SARS-CoV-2 Monoclonal Antibodies*.[8] But unlike New York, Washington does not use race as an independent risk factor and its guidance expressly states that "[t]he risk of COVID-19 is not connected to race, ethnicity or nationality." *Id.* The directives fail narrow tailoring.

## II. Plaintiffs Satisfy the Other Preliminary Injunction Factors

All of the other factors for a preliminary injunction are satisfied here. Defendants rehash many of their arguments on standing in arguing that Plaintiffs cannot show irreparable harm. But as discussed above (at 3–5), Defendants' directives plainly injure Plaintiffs on the basis of race. Further, although the State suggests that Plaintiffs' injury can be "remedied if a court waits until the end of trial," State Opp. 24, reality dictates otherwise. Anyone can catch COVID-19 at any time, and New York notes that these potentially lifesaving treatments must be taken within days of symptom onset. *See* Complaint, Exh. A. A preliminary injunction is therefore needed to prevent irreparable harm. The balance of hardships and public interest factors merge in cases where the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both factors counsel in favor of preliminary relief. Absent a preliminary injunction, Plaintiffs are not assured equal access to COVID-19 treatments during a rapidly evolving pandemic. By contrast, a preliminary injunction will allow Defendants to allocate treatments on the basis of any factor except race. Finally, a preliminary injunction is in the public interest, which "requires obedience to the Constitution." *Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980).[9]

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunction should be granted.

---

[8] https://doh.wa.gov/sites/default/files/2022-02/821-155-InterimMonoclonalAntibodyGuidance.pdf (last updated Feb. 23, 2022).

[9] Plaintiffs also win under the "serious questions" standard for preliminary relief. *See* PI Mot. 17. Defendants err in contending that Plaintiffs seek a mandatory injunction. *See Christa McAuliffe*, 364 F. Supp. 3d at 274–75 (noting that the status quo to be preserved by a preliminary injunction is not the situation that exists when the lawsuit is filed, but the last uncontested status which preceded the present controversy). Nonetheless, because Plaintiffs can show a substantial likelihood of success, they prevail under either standard.

Respectfully submitted this 28th day of February 2022.

| | |
|---|---|
| JONATHAN M. HOUGHTON, <br> E.D.N.Y. ID No. JH 5334 <br> N.Y. Bar No. 2955326 <br> Pacific Legal Foundation <br> 3100 Clarendon Blvd., Suite 610 <br> Arlington, VA  22201 <br> Telephone:  (916) 419-7111 <br> Facsimile:  (916) 419-7747 <br> JHoughton@pacificlegal.org |  s/  Wencong Fa <br> WENCONG FA, Cal. Bar No. 301679* <br> ANASTASIA P. BODEN, <br> Cal Bar No. 281911* <br> CALEB R. TROTTER, <br> Cal. Bar. No. 305195* <br> Pacific Legal Foundation <br> 555 Capitol Mall, Suite 1290 <br> Sacramento, CA  95814 <br> Telephone:  (916) 419-7111 <br> Facsimile:  (916) 419-7747 <br> WFa@pacificlegal.org <br> ABoden@pacificlegal.org <br> CTrotter@pacificlegal.org |

*Counsel for Plaintiffs*

*\*Pro Hac Vice*

11

## AFFIRMATION OF SERVICE

      I, Wencong Fa, declare under penalty of perjury that I filed the foregoing with the Clerk of the Court of the Eastern District of New York through the CM/ECF system, which will serve notice of said filing on all counsel of record.

                                                                                     s/ Wencong Fa
                                                                                     Attorney for Plaintiffs